UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Deshawn Daniel,

    Plaintiff,

    v.

City of New York and John/Jane Does ## 1-5

    Defendants.

**COMPLAINT**

Case No. 18-cv-3717

Jury Trial Demanded

    Plaintiff, by and through his attorney, Gregory Antollino of Antollino, PLLC, hereby files this Complaint against Defendant, and states as follows:

1. Under 42 U.S.C. 1981, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to . . . sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.:

2. Although the New York City Human Rights Law purports to protect "discriminatory harassment," NYC Administrative Code 8-126, the law has an explicit exception for law enforcement, however, so this exalted law against discrimination does not apply to police officers: "discriminatory harassment or

1

violence . . . shall not apply to acts committed by members of the police department in the course of performing their official duties as police officers whether the police officer is on or off duty." NYC Administrative Code 8-131.

3.    Thus, in other words, police officers have a statutory license to discriminate and harass based on that discrimination in New York City. There is no wonder the City has such a problem with its police culture. Cops are undisciplined or disciplined in such a minor manner as to have no effect. As one police officer told a client of mine who had been abused, "Go ahead make a report, the City pays for our fuck ups."

4.    Perhaps there are other limits to discriminatory harassment in police regulations, but they are barely enforced. The Civilian Complaint Review Board workers often recommend discipline, but it is rejected by the actual commission or by the police command. A recent log of police discipline published on <u>BuzzFeed</u> available at <u>https://tinyurl.com/yaemvtaf</u> show that between 2011 and 2016, most officers who were found guilty of misconduct merely forfeited vacation days (this is based on an random search and a one-year suspension was imposed in one case). A more comprehensive search can be done, but the undersigned could find only one suspension – or any worse discipline.

5.    In another case known to this attorney, a Staten Island officer smashed a radio into an alleged perpetrator, cutting a gash in his head for which the client needed staples. He was in possession of marijuana, but the cop falsely charged

him with resisting arrest – for which he was acquitted – in order to justify the use of force.

6. Although a camera pointed directly at the event, the officer behind the camera witnessed the event, and ran out and started beating up the "perp" who was all of 17 and 130 pounds. The officer did not flag the tape, however, so as to preserve the evidence – in fact he did this intentionally to avoid evidence of the abuse - and he was reprimanded for that, but not the use of force; the officer who used force received no discipline. The was the same precinct where Eric Garner was choked to death.

7. One of the two officers brought up on charges in this City in the last few years who were convicted got punished by a "conditional discharge" which essentially means the convicted defendant is free to go – that was for a cop whose pushed a bicyclist on the road, lied in his paperwork about how he got injured.

8. In another case, even a progressive DA, now deceased, prosecuted a cop who was convicted of manslaughter, but was given no jailtime, just probation.

9. When an individual makes a serious complaint of police misconduct to the CCRB, it refers the case to the Internal Affairs Bureau, which the send it to the precinct. Its investigations about police officers, outsourced to the local commands, thus the officer investigating a colleague might be sitting right next to them.

10. These results, as anecdotal information has shown the undersigned, in under investigation and swaying an investigation. In one case that occurred in

Brooklyn, for example, the cop alleged the existence of a knife, but the complaining witness mentioned only a pair of scissors. Nevertheless, the IAB officer tried to sway the witness to say knife. He did not.

11. In the same case, when a third-party witness verified that a police officer had hit a civilian with her patrol car, he immediately stopped the questioning.

12. In a case in Manhattan where an officer investigated was alleged to have given an illegal cavity search to a disabled man with arthritis, the local IAB was rude and spoke quickly when questioning the complainant, who asked to speak in Spanish. She refused but later allowed another witness to speak in Spanish. A third party witness was subtly warned not to cooperate with his counsel – and he had none at the time – and even though the complainant provided probable cause for an arrest, the IAB closed the case on the pretext that there was no video and the complainant who was not allowed to speak in Spanish was "uncooperative," a catch - all basis for dismissal that can be applied to being unavailable at the time the IAB contacts him or her to not knowing English and being unable intellectually to keep up with a fast talking cop wanting to protect her brother.

13. The police in this City are practically immune from significant discipline, especially, even after the end of stop and frisk, they know they can get away with arresting people without probable cause and abuse of power, especially if they are black or Hispanic.

14. Jim Crow is not a thing of the past. Just as museums are erected in

Montgomery, Alabama to commemorate the lynchings and horrors of slavery and post- reconstruction failures, Jim Crow exists and is flouted openly in this City by a Mayor who, despite his liberal credentials, is afraid of the police unions. The only difference is that Jim Crow is not enforced by the citizens of the City, just its police.

15. When the victims of police misconduct take officers to court, they are accused of attempting to "win a jackpot." One judicial officer accused them of trying to make "a living" off of suing the city.

16. This is just one judicial officer, however. The rest judges the mayor and its corporation counsel attempt to wear down in the *attempt* to curry favor with the police by insisting on bringing every case to trial – despite a complete lack of resources to do so – rely on pro-police bias to win at trial. Sometimes they are successful, sometimes they are not, but the plea offers are ridiculous.

17. The corporation counsel refuses to consent to the use of magistrate judges even though U.S. Attorneys do as a matter of course. Magistrates are judicial officers employed by the trial judges and if there is consent, the parties can try the case before them; they are often more qualified than the district judges to try cases, many having spent more time on the bench.

18. The Magistrates try to get it right because they have an incentive to be elevated to lifetime appointments as judges.

19. But the City – including its supposedly progressive Mayor and African-

American Corporation Counsel, the latter of whom got his start defending the poor – purposely because the trial judges are much busier. Ipso facto, they have less time to try cases.

19. This white attorney can attest that he walks unmolested in his neighborhood: Over twenty-five years and I have never been stopped.

20. Fortunately, I don't have to act like the trustees managing the black and Hispanic folk who live uptown; and as long as one is a cop, it doesn't matter what race he is. His brother is the police officer, not the citizen. These are protected by City government, as well as their brothers and sisters.

21. But 42 U.S.C. § 1981 does not exempt them from discriminatory harassment. In fact, the law makes clear that § 1981 applies to private actors as well as those acting under color of state law. It is time to start using this statute to reign in the abuse of the police of this City, who target men and women of color as a matter of course deprive them of due process and equal protection of the laws. If the most "liberal" mayor in decades won't do it – nor even reasonably make amends in court for his police officers' misdeeds. We need to call policing what it is in this City: Institutionalized racism engendered to promise those with means that they are safe in their neighborhoods, even though crime has significantly declined.

22. It was only until last year that the NYPD admitted to using quotas or "goals" in the issuance of summonses so they can flout their activity. What few know, however, is that the summonses are sent to separate courtrooms where retired

6

judges sit for $500 a day and act as prosecutor, collecting fines for the City like the Justice Department found they did in Ferguson, Missouri. The people granted these summonses <u>are not</u> told they have the right to a criminal court judge; they are simply told to sign and waive their right to one. This allows the City to arrest more people and issue more summonses, because if everyone stood their ground and demanded their right to a criminal court judge, not a single misdemeanor would be tried, perhaps defendants could refuse to plea and bring the system to a halt.

23.  In the meantime, the brutality these officers – few of whom live in New York City – inflict on the unlucky arrestees is grotesque, as we shall see.

### THE PARTIES, JURISDICTION AND VENUE

24.  Plaintiff repeats and realleges all previous paragraphs

25.  Plaintiff a black man in his thirties – 5'6" and 120 pounds – was on March 18, 2015, obeying all laws as he turned his Mercedes CLK 500 2005 onto Adam Clayton Boulevard onto the Macomb's Bridge.

26.  He is used to being harassed by NYPD on a regular basis. In fact, in 2012, he won a settlement against the City of New York because, while down the sidewalk, he was accused of being in a nearby park after hours. In fact, this was not true, and a part of the City's quota system for arrests.

27.  The officers grabbed him, threw him to the ground, and stomped on his fingers, causing a "Mallet Finger" that makes his finger bent. He remains in pain to this day when he tries to write or lift heavy objects. So, with the settlement, he

7

bought a used Mercedes. Shame on him! How dare he?

28. The officers who caused the Mallet finger were not disciplined.

29. But, ironically, driving the Mercedes got plaintiff disciplined, because up in Harlem black people are not supposed to have Mercedes.

30. Undercover and uniformed police officers were stationed near the Domino's Pizza at 148th Street. The car was unmarked, but the officers took out their red and blue lights and pulled plaintiff over. Plaintiff complied and provided his license and registration and checked out his information on the computer, in which it is believed they were able to see his previous false arrest. Even sealed arrests – the majority of which are made of people of color – are not sealed to the eyes of the police. Why? That is a violation of their due process rights. Under the Criminal Procedure Law, a dismissed arrest is supposed to be a nullity. But if a police officer can see it in determining whether there is probably cause, that's no nullity.

31. As such, notwithstanding that the previous arrest result not only in no conviction, but a nonsense settlement, it was used against plaintiff in the officer's probable cause analysis.

32. A black man with an arrest record driving a Mercedes? There must be something up.

33. The officers returned to the vehicle and ask him to step out of the vehicle. They said he was being booked for making an illegal left turn on the Macomb's Dam Bridge, but this was a lie: First, they couldn't see that he had made his left turn from 7

blocks away in the dark. Second, a left turn was legal. After the bridge, you have three choices: Take a left on Macomb's Place, which – if the police were suspicious of the black man in a Mercedes, it would have required a chase; straight on 155th, which would also have required a chase; or a left on 7th, which brought him to defendants where he was asked to pull over and voluntarily stopped near the Domino's Pizza on 148th Street. His only other alternative would have required him to go over the barrier on the bridge and drive against traffic; they didn't accuse plaintiff nor cite him for doing something so reckless if they had been able to get him. He went in the proper direction and was pulled over at 148th and 7th near Dominoes.

34. A map of the area looks like this:





35. They opened the door and pulled him out. From that point, they searched Mr. Daniel and put him in the back of their car then they search the vehicle.

36. One officer asked, "How you own a Mercedes convertible?" In fact, plaintiff is used to this question and to being harassed by the police – it is their continuing course of conduct, and once he got a settlement for a false arrest. But that the City pays for the City's "fuck ups" means nothing.

37. They did not find anything in the vehicle but took him to the precinct and towed the car there as well.

38. At the precinct, the officers said they had to do a strip search. There was no

probable cause for this other than that he was black with a Mercedes. Defendants put him in a cell where he stayed for two or three hours.

39. They made him take his clothes off right there in front of other prisoners in the holding cell. They were holding him on a table in his boxer shorts.

40. Plaintiff is saying "this is crazy" "oh my god this is not right!" His genitals were showing out of the loose boxer shorts. He had handcuffs on.

41. Then they put him on a wall where they do mugshots and fingerprint imaging and then one of the four officers you tried to do a cavity check. Plaintiff refused and turned away. The idea!

42. That's when defendants picked plaintiff up and slammed him on the desk and twisted his arm, which was bleeding.

43. They gave up on the cavity search. He did not know what a cavity search was, but a male officer - one of the undercovers (two of four) up put a glove on without lubricant and tried to shove it up his anus.

44. At that point plaintiff was outraged, objected and did not consent.

45. Defendants picked him up and slammed him on the same table as before and once they put him on the table there were three or four officers holding him down He was hit with such force that he screamed in pain and was bleeding because the handcuffs were still on.

46. Of four officers, they ranged from 5'8" and stocky to over six feet and pumped. They were two Caucasians and two Hispanic Caucasians.

11

47. They told him to put his clothes back on and put him back in the cell. He wanted medical attention but was told that he was going to be leaving soon and could get it himself (he did and took pictures). One is here:



48. Realizing this was another police officer "fuck up" that they would not be punished for, they dolefully offered chips and a soda to plaintiff, but he refused.

49. After three hours, they let him go, but gave a paper for his items, which included $100. The $100 was not returned to him.

50. Sheepishly, these criminals told him to stay. They gave him the $100.

51. They falsified a charge that he was in possession of a "butterfly knife." There was no such knife. That was a lie and if he did have a butterfly knife it would not have been illegal. They accused his of saying he kept it for his personal protection,

which is false. He was not Mirandized in any case.

52. His case was dismissed on 6/13/16. During the time of the detention, the attempt at an anal cavity probe and the present, plaintiff has been to the hospital several times. His Mallet Finger was exacerbated such that he cannot lift more than three pounds with his bad hand, two pounds more than a cell phone.

53. He reported the incident IAB. He was visited by police and asked to pick out names. He awaited a response before he filed, but never got one.

54. Based on the way IAB works, the officers were exonerated.

55. This event has caused his significant emotional and physical distress. Mr. Daniel demands redress.

FIRST CAUSE OF ACTION
42 U.S.C. § 1981

56. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein.

57. All persons within the United States have the right to make and enforce contracts, including employment contracts, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

58. Plaintiff is not a white citizen and is entitled to Equal Protection and Freedom from violation of the 4th Amendment.

59. As a black man, he is subject to two things when the police with no probable

cause accost him: statutory racism and violation of his constitutional rights. These are two causes of action because a white person subject to a violation of § 1983 is not subject to racism (at least not in New York), which is a separate and distinct harm.

60. To relegate racism to § 1983 is to deny equal protection of the laws because it ignores then equal harms of racism: All of the police actions as part of this continuing course of conduct were motivated, at least in part, by plaintiff's race.

61. As a result of the foregoing, defendants have violated §1981 and plaintiff demands redress.

## SECOND CAUSE OF ACTION
## ILLEGAL SEARCH AND SEIZURE 42 U.S.C. § 1983

62. Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs as if fully set forth herein.

63. Defendants acted under color of state law. They had no probable cause to search plaintiff in any manner and Plaintiff was deprived of his rights as secured by the Fourth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

64. As a result of the foregoing, plaintiff has been damaged and demands compensatory and punitive damages.

## THIRD CAUSE OF ACTION
## EXCESSIVE USE OF FORCE 42 U.S.C. § 1983

65. Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs as if fully set forth herein.

66. Defendants acted under color of state law.

67. Defendants had no probable cause to touch plaintiff in any manner; therefore, any force he might have used was excessive.

68. However, they attempted to strip search him and handcuffed and placed him on a table.

69. Plaintiff was deprived of his rights as secured by the Fourth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

70. As a result of the foregoing, plaintiff has been damaged and demands compensatory and punitive damages.

## FOURTH CAUSE OF ACTION MALICIOUS PROSECUTION
## 42 U.S.C. § 1983

71. Plaintiff repeats and realleges the previous allegations as if fully set forth herein.

72. Acting under color of state law, defendants brought charges against plaintiff without probable cause, initially or at such time as it should have known there was no probable cause, and plaintiff was subject to post-arraignment deprivation.

73.     As a result of the foregoing, Plaintiff has been damaged and demands compensatory and punitive relief.

### FIFTH CAUSE OF ACTION FAILURE TO INTERVENE
### 42 U.S.C. § 1983

74.     Plaintiff repeats and realleges the previous allegations as if fully set forth herein.

75.     under color of state law, all officers had a duty to intervene and stop the illegal actions.

76.     As a result of the foregoing, Plaintiff has been damaged and demands compensatory and punitive relief.

### SIXTH CAUSE OF ACTION ATTEMPT TO DEPRIVE OF FAIR TRIAL
### 42 U.S.C. § 1983

77.     Plaintiff repeats and realleges the previous allegations as if fully set forth herein.

78.     Defendants lied about the butterfly knife which does not exist.

79.     Defendants lied when they said plaintiff said he used said knife for "personal protection."

80.     Defendants did not Mirandize plaintiff in any case.

81.     Acting under color of state law, all officers had a duty to intervene and stop the illegal actions.

82.     As a result of the foregoing, Plaintiff has been damaged and demands compensatory and punitive relief.

## SEVENTH CAUSE OF ACTION MONELL/SUPERVISORY LIABILITY
## 42 U.S.C. §§ 1981, 1983

83. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein.

84. As a result of the foregoing, the NYPD maintains a policy and practice that targets minorities, engages in false arrest, overlooks police misconduct, and engages in excessive force.

WHEREFORE, Plaintiff respectfully request that this Court find against Defendant as follows:

    a. Award Plaintiff the value of all compensatory damages as a result of emotional distress, physical pain and suffering and loss of reputation

    b. Award punitive damages;

    c. Award Plaintiff prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

    d. Award Plaintiff such other relief as this Court deems just and proper.

Dated:    New York, New York
           April 26, 2018

By:   */s/ Greg S. Antollino*
      Gregory Antollino, Esq.
      Principal, Antollino, PLLC
      Attorney for Plaintiff

275 Seventh Avenue Suite 705
New York, NY 10001
(212) 334-7397